1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENDRA DICKERSON, on behalf of Minor W.E.T., | Case No.  1:22-cv-01217-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 17, 18, 19) |
| Defendant. | |

## I.

## INTRODUCTION

Kendra Dickerson, on behalf of Minor Plaintiff W.E.T. ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff's application for supplemental security income ("SSI") benefits pursuant to the Social Security Act.  Defendant filed a cross-motion for summary judgment and opposition to Plaintiff's brief.  The matter is currently before the Court on the parties' briefs, which were submitted without oral argument, to Magistrate Judge Stanley A. Boone.[1]  For the reasons set

---

[1]  The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to Magistrate Judge Stanley A. Boone for all purposes.  (See ECF Nos. 10, 12, 13.)

1

forth below, Plaintiff's appeal shall be denied and Defendant's cross-motion for summary judgment shall be granted.

## II.

## BACKGROUND[2]

On May 10, 2018, a Title XVI application for SSI was protectively filed on behalf of Plaintiff, who was eight years old at the time, alleging a period of disability beginning on May 1, 2016 (age six) due to learning disability, valley fever, and asthma.  (See Admin. Rec. ("AR") 115, 251–57, 294, ECF No. 14-1.)  Plaintiff's application was initially denied on August 10, 2018, and denied upon reconsideration on October 31, 2018.  (AR 127, 142.)  The hearing was postponed multiple times to permit Plaintiff to submit updated records, and the medical expert to review them.  (See AR 27.)  However, on March 25, 2021, Plaintiff appeared via phone teleconference (with his mother), due to the extraordinary circumstance presented by the Coronavirus pandemic, for a hearing before Administrative Law Judge Debra L. Boudreau (the "ALJ").  (AR 77–100.)  Plaintiff and his mother, Kendra Dickerson, testified during the telephonic conference.  Dr. Kristy Farnsworth, Ph.D., an impartial medical expert, also testified at the hearing.  (AR 92–99.)  On April 12, 2021, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 24–42.)  On June 21, 2022, the Appeals Council granted Plaintiff's request for review.  (See AR 4.)  On July 26, 2022, the Appeals Council issued a final decision affirming the ALJ's finding of nondisability.  (AR 1–9.)

Plaintiff initiated this action in federal court on September 23, 2022, and seeks judicial review of the denial of his application for SSI benefits under Title XVI.  (ECF No. 1.)  The Commissioner lodged the administrative record on December 21, 2022.  (ECF No. 14.)  On March 8, 2023, Plaintiff filed a motion for summary judgment as to his appeal of the decision of the Commissioner of Social Security.  (ECF No. 17.)  On April 24, 2023, Defendant opposed Plaintiff's motion and filed a cross-motion for summary judgment.  (ECF No. 18.)  On May 9, 2023, Plaintiff filed a reply (ECF No. 19), and the matter is deemed submitted.

---

[2] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.**

**LEGAL STANDARD**

**A.     The Disability Evaluation Under Childhood Standards**

An individual under the age of eighteen will be considered disabled if he has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. The Social Security regulations provide a three-step process in determining whether a child is disabled. See 20 C.F.R. § 416.924. First, the ALJ must determine whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If the child is not engaged in substantial gainful activity, then the analysis proceeds to step two. Step two requires the ALJ to determine whether the child's impairment or combination of impairments is severe. Id. The child will not be found to have a severe impairment if it constitutes a "slight abnormality or combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). However, if there is a finding of severe impairment, the analysis proceeds to the final step. Step three requires the ALJ to determine whether the impairment or combination of impairments "meets, medically equals or functionally equals" the severity of a set of criteria for an impairment in the Listing of Impairments ("listings"). 20 C.F.R. § 416.924(d).

If an impairment does not meet the requirements of, or is not medically equal to, a listed impairment, the claimant may still be disabled if his impairment or combination of impairments is found to be "functionally equivalent" to a listed impairment. In child disability cases, a "whole child approach" is used to determine functional equivalence. R.S. by & Through Herrera v. Berryhill, 357 F. Supp. 3d 1033, 1037 (C.D. Cal. 2019). That is, the ALJ considers all of the child's activities, "everything [the child does] at home, at school, and in [the] community." 20 C.F.R. § 416.926a(b). Functional equivalence is measured by assessing the claimant's ability to function in the following six domains, which are "broad areas of functioning intended to capture all of what a child can or cannot do": (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating

3

objects; (v) caring for yourself; and (vi) health and physical well-being. 20 C.F.R. §§ 416.926a(b)(1)(i)–(vi). Limitations in functioning must result from the child's medically determinable impairments. See 20 C.F.R. § 416.924a (describing considerations for determining disability for children). An impairment or combination of impairments is functionally equivalent to a listing if it results in "marked" limitations in two areas, or an "extreme" limitation in one area of functioning. 20 C.F.R. § 416.926a(a).

**B.    Standard of Review**

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). The Court reviews only those issues raised by the party challenging the decision. See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001). In reviewing an ALJ's decision regarding a child's functional equivalence, the Court considers whether it is supported by substantial evidence. See Howard v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003) (reviewing ALJ's functional-equivalence determination under substantial-evidence standard). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly erroneous standard). "[T]he threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard." Thomas v. CalPortland Co. (CalPortland), 993 F.3d 1204, 1208 (9th Cir. 2021) (internal quotations and citations omitted); see also Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996). Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless. Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1055–56 (9th Cir. 2006). Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020) (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).

## IV.

### THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff was eleven years old at the time of the ALJ's decision on April 12, 2021.  (See AR 28, 36.)  The ALJ conducted the three-step disability analysis set forth under 20 C.F.R. § 416.924(a) for claimants under the age of eighteen and issued the following findings of fact and conclusions of law:

(1)    Plaintiff was born on January 16, 2010.  Therefore, he was a school-age child on May 10, 2018, the date the application was filed, and was still a school-age child as of the date of issuance of the ALJ's decision on April 12, 2021.  (AR 28 (citing 20 C.F.R. § 416.926a(g)(2)).)

(2)    Plaintiff has not engaged in substantial gainful activity since May 10, 2018, the application date.  (Id. (citing 20 C.F.R. §§ 416.924(b); 416.971 et seq.).)

(3)    Plaintiff has the following severe impairments: attention deficit hyperactivity disorder (ADHD), a learning disorder, and coccidioidomycosis (valley fever).  (Id. (citing 20 C.F.R. § 416.924(c)).)  Plaintiff also has nonsevere impairments: asthma.  (Id.)

(4)    At step three, the ALJ determined Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR 29 (citing 20 C.F.R. §§ 416.924, 416.925, 416.926).)

In reaching this determination, the ALJ stated she considered the combined effect of all medically determinable impairments, even those deemed nonsevere.  The ALJ determined

5

Plaintiff did not meet the "paragraph B criteria"[3] because he did not have at least two "marked" limitations or one "extreme" limitation.  More specifically, the ALJ determined Plaintiff had:

- A "moderate" limitation in the functional area of understanding, remembering, or applying information;

- "No limitation" in the functional area of interacting with others;

- A "marked" limitation in the functional area of concentrating, persisting, or maintaining pace; and

- "No limitation" in the functional area of adapting or managing oneself.

(AR 29–30.)

(5)     Plaintiff does not have an impairment or combination of impairments that functionally equals the severity of the listings.   (AR 30 (citing 20 C.F.R. §§ 416.924(d), 416.926a).)

In reaching this functional equivalence determination, the ALJ applied the "whole child" standard[4] (*i.e.*, how Plaintiff functions at home, at school, and in the community; the interactive and cumulative effects of all of Plaintiff's medically determinable impairments on his activities; and the type, extent, and frequency of help Plaintiff needs) with respect to the six domains, and determined Plaintiff had the following limitations:

---

[3] The "paragraph B" criteria evaluate mental impairments in the context of four broad areas of functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing themselves.  20 C.F.R. § Pt. 404, Subpt. P, App. 1; see also 20 C.F.R. §§ 416.925 (describing ALJ's special technique for evaluating paragraph B criteria), 416.926 (explaining rules for evaluating medical equivalence).  The severity of the limitation a claimant has in each of the four areas of functioning is identified as either "no limitation," "mild," "moderate," "marked," or "extreme."  Id.  To satisfy the paragraph B criteria, a claimant must have an "extreme" limitation in at least one of the areas of mental functioning, or a "marked" limitation in at least two of the areas of mental functioning.  Id.  An "extreme" limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  Id.  A "marked" limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.  Id.  A "moderate" degree of mental limitation means that functioning in this area independently, appropriately, effectively, and on a sustained basis is "fair."  Id.  Finally, a "mild" degree of mental limitation means that functioning in this area independently, appropriately, effectively, and on a sustained basis is "slightly limited."  Id.

[4] Similar to the paragraph B criteria, to functionally equal the listing under the "whole child" standard, a claimant's impairment of combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  SSR 09-1p, available at 2009 WL 396031 (Feb. 17, 2009); 20 C.F.R. § 416.926a.  In making this assessment, the ALJ must compare how appropriately, effectively, and independently the claimant performs activities compared to the performance of other children of the same age who do not have impairments, id., as discussed in greater detail herein.

- A "less than marked" limitation in acquiring and using information;

- A "less than marked" limitation in attending and completing tasks;

- No limitation in interacting and relating with others;

- No limitation in moving about and manipulating objects;

- A "less than marked" limitation in caring for yourself; and

- A "less than marked" limitation in health and physical well-being.

(AR 30–36.)

(6)     Finally, the ALJ determined that Plaintiff has not been disabled, as defined in the Social Security Act, since May 10, 2018, the date the application was filed.  (AR 36 (citing 20 C.F.R. § 416.924(a)).)

On review of the ALJ's decision, the Appeals Council reviewed the record, plus supplemental records submitted by Plaintiff (AR 241–50, 489–515 (Supp. list of Exs. 16B, 17B, 27E, and 28E)), and adopted the ALJ's statements regarding the pertinent provisions of the Social Security Act, Social Security Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, the evidentiary facts, and the ALJ's findings and conclusions as to whether Plaintiff is disabled.  (AR 4–5.)  As to Plaintiff's supplemental evidence, a Psycho-Educational Triennial Assessment dated March 5, 2018 from Greenfield Union School District (AR 489–510), the Appeals Council found the report supports and is consistent with the ALJ's findings regarding the effects of Plaintiff's impairments on his functioning.  Further, the Appeals Council noted the hearing transcript indicates the ALJ considered Plaintiff's eligibility for special education services under federal and state education guidelines.  (AR 5–6.)

Accordingly, the Appeals Council adopted the ALJ's findings that Plaintiff's severe medically determinable impairments of ADHD, learning disorder, and valley fever do not meet or medically equal any of the listings—including but not limited to Section 112.00 (Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1); it adopted the ALJ's findings that such impairments do not singly on in combination functionally equal any listing; and it adopted the ALJ's findings with respect to the six domains of functioning.  (AR 5–6.)  Finally, the Appeals Council issued its decision that, based on the application filed May 10, 2018, Plaintiff is not

1   eligible for SSI payments under sections 1602 and 1614(a)(3)(C) of the Social Security Act.  (AR

2   7.)

3

**V.**

**DISCUSSION AND ANALYSIS**

Plaintiff challenges the ALJ's application of the "whole child" standard with respect to two of the six domains at step three of the disability inquiry.[5]  He raises a single issue on appeal, which is rather broadly characterized as follows: "The ALJ's functional equivalence analysis is not supported by substantial evidence as Claimant has marked limitations in acquiring and using information and attending and completing tasks as supported by the evidence of record including the opinions of those who have interacted with Claimant."[6]  (ECF No. 17 at 3.)  Plaintiff argues that, if the ALJ had properly determined he had "marked," and not "less than marked," impairments in both of the two identified domains, the inquiry would have resulted in a finding of disability.

### A.    Legal Standards

#### 1.    Rating Severity of Limitations in the Domains/Functional Equivalence

Regarding functional equivalence, the ALJ must assess the interactive and cumulative effects of all the impairments supported by the evidence, both severe and nonsevere.  20 C.F.R. § 416.926a(a).  The ALJ is to consider all relevant factors, including but not limited to: (1) how well the child can initiate and sustain activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment.  Id. (citing 20 C.F.R. §§ 416.924a, 416.924b, 416.929).

The more help or support of any kind that a child receives beyond what would be

---

[5] As previously noted, the ALJ ultimately concluded Plaintiff had "less than a marked" limitation in the domains of (1) "acquiring and using information," (2) "attending and completing tasks," (3) "ability to care for himself," and (4) "health and physical well-being," and no limitation whatsoever in the domains of (5) "interacting and relating with others," and (6) "moving about and manipulating objects."  (AR 31.)

[6] Notably, Plaintiff does not challenge the ALJ's findings with respect to the severity of limitations in the other four domains or his physical impairments.  Nor does Plaintiff challenge the ALJ's discounting of Plaintiff's mother's testimony and allegations.  As such, these and any other issues not expressly raised are deemed waived.  See Lewis, 236 F.3d at 517 n.13; Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003) (stating court "will not consider any claims that were not actually argued in appellant's opening brief" and will only "review … issues which are argued specifically and distinctly in a party's opening brief.").

1    expected for children the same age without impairments, the less independent the child is in

2    functioning, and the more severe the limitation will be determined to be.  SSR 09-1P, at *7.

3          A "marked" limitation is one that "interferes seriously with [the child's] ability to

4    independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2).  It is "more

5    than moderate" but "less than extreme."  Id.  A child's "day-to-day functioning may be seriously

6    limited when [his or her] impairment(s) limits only one activity or when the interactive and

7    cumulative effects of [his or her] impairment(s) limit several activities."  Id.  It "is the equivalent

8    of the functioning [the Commissioner] would expect to find on standardized testing with scores

9    that are at least two, but less than three, standard deviations below the mean."[7]  Id.  Thus, the

10   Commissioner generally considers a child to have a "marked" limitation when he has a valid

11   score that is two standard deviations or more below the mean, but less than three standard

12   deviations, on a comprehensive standardized test designed to measure ability or functioning in

13   that domain, and [their] day-to-day functioning in domain-related activities is consistent with that

14   score."  20 C.F.R. § 416.926a(e)(2)(iii).  Importantly, the Commissioner notes that test scores

15   alone  do  not  establish  marked  or  extreme  limitation  in  a  domain,  20 C.F.R.  §§

16   416.924a(a)(1)(ii), 20 C.F.R. 416.926a(e)(4), as no single piece of information taken in isolation

17   can  establish  whether  the  child  has  a  "marked"  limitation  in  a  domain,  20 C.F.R.  §

18   416.926a(e)(4)(i).

19         SSR 09-1P explains the multitude of factors and evidence that must be considered in

20   evaluating the severity of the functional effect a claimant's impairment(s) has on each functional

21   domain.  It provides

22              To  determine  whether  there  is  a  "marked"  or  an  "extreme"
             limitation in a domain, [the ALJ] use[s] a picture constructed of the
23           child's functioning in each domain.  This last step in the "whole
             child" approach summarizes everything [the ALJ] know[s] about a
24           child's limited activities. The rating of limitation in a domain is
             then based on the answers to these questions:
25

26   _____

     [7] An "extreme" limitation, by comparison, "interferes very seriously with [the child's] ability to independently
27   initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3).  It is the rating given to "the worst limitations."
     Id.  Nonetheless, it "does not necessarily mean a total lack or loss of ability to function."  Rather, it is "the equivalent
28   of the functioning [the Commissioner] would expect to find on standardized testing with scores that are at least three
     standard deviations below the mean."  20 C.F.R. § 416.926a(e)(3)(i).

> 1. How many of the child's activities in the domain are limited (for example, one, few, several, many, or all)?
>
> 2. How important are the limited activities to the child's age-appropriate functioning (for example, basic, marginally important, or essential)?
>
> 3. How frequently do the activities occur and how frequently are they limited (for example, daily, once a week, or only occasionally)?
>
> 4. Where do the limitations occur (for example, only at home or in all settings)?
>
> 5. What factors are involved in the limited activities (for example, does the child receive support from a person, medication, treatment, device, or structured/supportive setting)?

Id. at * 7–10.  Notwithstanding the aforementioned questions, however, SSR 09-1p cautions that "there is no set formula for applying these considerations in each case.  Id. at *9.  Instead, it stresses the importance of considering the longitudinal record when evaluating the severity of the child's limitations.  Id.  Further, an ALJ is not required to discuss all of the considerations in their determinations and decisions, but must only provide sufficient detail so that a subsequent reviewer can understand how the ALJ made her findings.  Id. at *3.

     2.    <u>Acquiring and Using Information</u>

     In the domain of acquiring and using information, the agency "considers how well you acquire or learn information, and how well you use the information you have learned."  20 C.F.R. 416.926a(g); SSR 09-3p.  The regulation provides the following:

> (iv) School-age children (age 6 to attainment of age 12).  When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science.  You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions.  You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change).  You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv).

1          3.      Attending and Completing Tasks

2          In the domain of attending and completing tasks, the agency "considers how well you are

3  able to focus and maintain your attention, and how well you begin, carry through, and finish your

4  activities, including the pace at which you perform activities and the ease with which you change

5  them."  20 C.F.R. § 416.926a(h); see also SSR 09-4p, available at 2009 WL 39603 (Feb. 18,

6  2009).  The regulation provides the following:

> (iv) School-age children (age 6 to attainment of age 12).  When you
> are of school age, you should be able to focus your attention in a
> variety of situations in order to follow directions, remember and
> organize your school materials, and complete classroom and
> homework assignments.  You should be able to concentrate on
> details and not make careless mistakes in your work (beyond what
> would be expected in other children your age who do not have
> impairments).  You should be able to change your activities or
> routines without distracting yourself or others, and stay on task and
> in place when appropriate.  You should be able to sustain your
> attention well enough to participate in group sports, read by
> yourself, and complete family chores.  You should also be able to
> complete a transition task (e.g., be ready for the school bus, change
> clothes after gym, change classrooms) without extra reminders and
> accommodation.

15  20 C.F.R. § 416.926a(h)(2)(iv).

16      **B.      Plaintiffs' Argument**

17          With respect to the "acquiring and using information" domain, Plaintiff argues the ALJ

18  "ignored probative evidence and mischaracterized the record to manufacture support" for her

19  finding with respect to this domain.  (ECF No. 17 at 14–17.)  More specifically, Plaintiff argues

20  the ALJ improperly evaluated, mischaracterized, and/or ignored the findings set forth in school

21  psychologist Kaleigh Persel's December 2019 teacher questionnaire (id. at 15 (citing AR 399–

22  400)); Plaintiff's May 21, 2020 IEP (id. at 16 (citing AR 425, 428, 434)); and a March 5, 2018

23  triennial psychoeducation assessment documenting certain testing results (id. at 16–17 (citing AR

24  491, 496, 498, 507, 509)).

25          Regarding the domain of "attending and completing tasks," Plaintiff makes the same

26  "mischaracterization of and/or ignoring the evidence" argument (ECF No. 17 at 17–21), citing

27  again to Dr. Persel's December 2019 teacher questionnaire (id. at 18 (citing AR 399–406)); Dr.

28  Venter's consult examination (id. at 18–19 (citing AR 518–25)); reports from Plaintiff's mother

11

(id. at 18–20 (citing AR 518–19)), testing results (id. at 19 (citing 521)), and two treatment notes from Kern Behavior Health and Recovery Services, dated September 13, 2018 and December 21, 2018 (id. at 19–20 (citing AR 551, 561–64, 632, 638–41)).

Plaintiff concludes this evidence "support[s] at least a marked finding in [each] domain," thus (assuming she incorrectly evaluated *both* domains), the ALJ's decision to the contrary constitutes reversible error.  (Id. at 17, 18, 21.)

### C.   Relevant Evidence

#### 1.   Plaintiff's Mother's Allegations

Plaintiff alleges limitations based on leaning disability, valley fever, and asthma.  (AR 294.)  His mother reported Plaintiff was in a special education program at school.  (AR 297, 315.)  She alleged Plaintiff sometimes have trouble talking clearly so that others can understand him, and he generally does not talk to others.  (AR 306–07.)  She alleged Plaintiff has difficulty learning, reading, writing, choosing clothes and dressing himself, tying shoelaces, bathing himself, helping around the house, obeying safety rules and instructions, finishing things he starts, keeping himself busy, completing homework or chores, and working on arts and crafts projects.  (AR 308–09, 311–12.)  She also alleged Plaintiff has friends and generally gets along with her and other adults.  (AR 310.)

During Plaintiff's January 7, 2017 consultation examination with Dr. Venter, Plaintiff's mother reported that, although Plaintiff would be in first grade at that time, she was asked to put him back in kindergarten because he was behind his age group, had difficulty with reading, writing, focusing, and recalling information, and would have to repeat the first grade.  (AR 518.)  At that time, Plaintiff's mother reported Plaintiff was not receiving special education, but did receive extra help from tutors.  Plaintiff did not receive speech therapy.  (AR 520.)  Plaintiff's mother reported Plaintiff is hyperactive and cannot sit still, has to play and move around all the time, and has anger outbursts when he can't get what he wants.  (AR 518–19.)  She reported Plaintiff sat alone at 11 months, walked without holding on at 2 years, fed himself at 3 years, and said his first words and was able to speak in a sentence at age 2 years.  (AR 519.)  Plaintiff goes to bed at 8 o'clock at night; he is able to use a spoon and fork to eat; he cannot dress or undress

himself, tie his shoes, wash his hands and face, or bathe without help; he is able to toilet independently; when he helps out around the house, he does so poorly or forgets to do it; he does not handle money independently or earn spending money; he enjoys playing with his action figures.  Plaintiff's mother reported Plaintiff lives with his mother, grandmother, and younger brother; he has a "fair" relationship with his family, relatives, and brother, and he enjoys going to church with his family.  (AR 520.)

At the March 2018 Individualized Education Program ("IEP") meeting at Plaintiff's school, Plaintiff's mother reported Plaintiff is good at remembering things and is outspoken; he likes robot toys and playing by himself; he gets irritated when he is around other students; and he can't sit in one spot and likes to move.  (AR 290.)  She also reported Plaintiff had valley fever and asthma, both of which he took medication for at home, and allergies, for which he was not taking medication.  The IEP report also noted Plaintiff's mother was unhappy with the outcome of the IEP and walked out of the meeting without signing any of the documents (which included consent forms for placement in special education), stating she would complain to support services.  (AR 291.)

At his September 13, 2018 assessment with Kern Behavioral Health and Recovery Services, Plaintiff's mother reported Plaintiff had issues at school, was getting into trouble frequently, using foul language, threatening other kids, not doing work in class, and was constantly disruptive; in particular, Plaintiff would isolate himself at school and home, and when bothered, Plaintiff would display anger and aggression.  (AR 454, 458.)  Plaintiff's mother also reported Plaintiff has poor communication with family and peers.  (AR 458.)  On a scale of 1 (worst they've ever been) to 10 (no problems), she rated Plaintiff's progress as a 5.  (AR 455.) She reported Plaintiff met all his milestones on time: he started walking at age 1.5, talking at age 1.5, and was bathroom trained at age 2.5.  (AR 457.)  Plaintiff's mother reported she and Plaintiff's father separated during the past year (in 2017), and that the father is currently in prison. (AR 458.)

At the December 21, 2018 assessment, Plaintiff's mother reported symptoms of hyperactivity, impulsivity, easily distracted, trouble concentrating, aggression, isolates, low self-

esteem, risky behavior, does not follow, shifts blame onto others, restless sleep which impairs social, independent, and educational functioning; she further reported that Plaintiff continues to struggle to brush his teeth and shower.  (AR 632, 634.)  She reported Plaintiff was new to his school and was being bullied over his weight and inability to read and write.  (AR 632.) Plaintiff's mother reported Plaintiff has a good memory, is active, creative, daring, loves God, dances and sings.  (AR 633.)  Plaintiff's coping skills included: able to challenge negative thoughts, laughs, and will go to his room for about 20–30 minutes.

At his February 13, 2019 psychiatric evaluation, Plaintiff's mother reported the same behavior as reported at the September 13, 2018 assessment.  (AR 474–75.)  In addition, Plaintiff's mother reported Plaintiff had a hard time falling asleep due to his energy levels and defiance; she stated Plaintiff's symptoms began in kindergarten.  (AR 474.)

At the April 2019 IEP meeting at Plaintiff's school, Plaintiff's mother reported she noticed a difference in Plaintiff's behavior as his test scores each week have improved.  (AR 447.)  She reported Plaintiff is more motivated to do his homework and is attempting to read more; he responds well to goals at school and shows a positive and helpful attitude at home.  She further reported the behavioral clinic was helping him as well.  She reported Plaintiff still had difficulty tying his shoes, getting himself ready independently, and regulating his emotions.

At the July 15, 2020 mental health reassessment, Plaintiff's mother reported the same symptoms as previously noted, but with respect to Plaintiff's experience in second grade.  (AR 840.)  She reported Plaintiff had moderate impairments in independent living and education, no physical impairments, and severe impairments in social relationships.  (AR 841.)  It was noted Plaintiff had received therapy and medications (Adderall and Trazodone) in treatment of these impairments.

### 2.   Education Records

#### a.   March 2018 Individualized Education Program

The records indicate Plaintiff was initially referred to the IEP program in February 2018. (AR 288.)  In March 2018, Plaintiff's first IEP was completed (AR 288–92.)

Plaintiff's teacher reported Plaintiff is progressing; that he was doing better in math than

reading; that his fluency was progressing and he did better in a small group; he focused better when he was working by himself.  (AR 290.)  It was noted Plaintiff was, at that time, reading at a second-grade level at an accuracy range of 80-90%; his writing was legible and age-appropriate, but became large and messy when Plaintiff rushed it; Plaintiff was able to complete 2-digit addition and subtraction with 100% accuracy.  Plaintiff's teachers reported his academic skills ranged from the beginning first grade to beginning second grade; Plaintiff's academic strengths were in mathematics.  Plaintiff's teachers observed Plaintiff to be on-task 90% of the time.

The school psychologist reported Plaintiff earned a general memory index standard score of 86 (low average) on the Wide Range Assessment of Memory and Learning-Second Edition ("WRAML-2") test; his verbal memory score was within the average range; visual memory score was within the low average range; and attention/concentration score fell within the low average range.  On the Motor-Free Visual Perception Test-Fourth Edition ("MVPT-4") test, the psychologist reported Plaintiff scored 116 (86th percentile, high average range).  On the Test of Auditory Processing Skills, 3rd Edition ("TAPS-3") test, Plaintiff scored a 79 (9th percentile); he showed weakness within the phonological index and auditory cohesion index.  On the Wechsler Individual Achievement Test–Third Edition ("WIAT-III") test, Plaintiff earned scores ranging from the below average to average range in all indexes.  Plaintiff's teachers noted the Behavior Assessment System for Children-Third Edition ("BASC-3") test revealed there were inconsistencies with the parents' index, indicating the response should be interpreted with caution.  The BASC-3 test further showed Plaintiff was within the at-risk or clinically significant classification range for hyperactivity and attention problems, but overall, Plaintiff was noted to display more behaviors at home than at school.  Plaintiff's teacher rated him as meeting the symptom count for ADHD based on DSM-5 criteria; he also received elevated scores in the areas of inattention, hyperactivity/impulsivity, learning problems, defiance/aggression, and peer relations.

It was noted Plaintiff's numerous tardies and absences (67 absences and 87 tardies as of March 19, 2018) had an impact on his progress.  (AR 291.)  However, it was noted Plaintiff was benefitting from Tier II support in the classroom and was responding to core instruction in the

1    classroom.

2         **b.      March 2018 Triennial Psychoeducation Assessment**

3         Plaintiff was referred and evaluated at his mother's request due to lack of academic

4    progress and behavioral concerns in the classroom and at home.  (AR 491–510.)  It was noted

5    Plaintiff was a "Tier II" student, who received 45 minutes of reading support in the classroom.

6    (AR 493.)  His second grade first and second trimester grades were reported as "far below

7    standards," and "needs improvement."  (AR 493–94.)  His first grade first through third trimester

8    grades ranged from "at standard" to "far below standard," with "satisfactory" and "needs

9    improvement" comments regarding his participation.  (AR 494.)

10        Disciplinary reports noted in October 2017 that Plaintiff was "hands on" with another

11   student during recess; he punched a female student in the stomach; and he used inappropriate

12   words.  (AR 495.)  In February 2018, Plaintiff fought with his cousin over a sweater that he found

13   in the lost and found, that did not belong to him.

14        Plaintiff received intervention and monitoring in the classroom.  (AR 495–96.)  As a

15   result, it was reported that Plaintiff demonstrated "substantial growth in his literacy skills,"

16   continuing to make progress in reading comprehension, reading fluency, and sight words.  (AR

17   496.)

18        Multiple tests were administered.  The WRAML-2 results indicated Plaintiff fell in the

19   low average range with respect to memory and learning skills.  (AR 498.)  The TAPS-3 results

20   fell in the well below average range, indicating Plaintiff's difficulties with integrating listening

21   and communication processing skills, understanding language and learning to read, receive, and

22   understanding auditory information and constructing meaning using language.  (AR 499–500.)

23   Plaintiff was observed in class under assignment and test-taking scenarios; he displayed on-task

24   and off-task behavior that was almost the same as his peers and the examiner did not see

25   behaviors related to off-task.  (AR 501–02.)  Plaintiff was reportedly able to get back to task

26   following prompts from his teacher, and he could follow 2–3 step directions.  (AR 502.)  The

27   Conners 3rd Edition Rating Scale ("Conners-3") results indicated concerns with inattention,

28   hyperactivity/impulsivity, learning problems, defiance/aggression, and peer relations.  (AR 505–

06.)  Based on these results, Plaintiff met the DSM-5 criteria for ADHD combined presentation, conduct disorder, and oppositional defiant disorder.  (AR 506.)  The BASC-3 results indicated Plaintiff was in the "clinically significant" range on the aggression scale and conduct problem scale, and "at risk" on the hyperactive scale.  (AR 502–05.)  The WIAT-III revealed Plaintiff's listening, speaking, reading, writing, and mathematics skills were generally below average; Plaintiff was assessed with skills ranging from beginning first grade to beginning second grade. (AR 506–08.)  The Curriculum Based Measurement ("AIMS web") results indicated Plaintiff's reading fluency skills were at the end of a first-grade level to the beginning of a second-grade level; his math skills were at the second-grade level.  (AR 508.)  The MVPT-4 results placed Plaintiff in the high average range, indicating that he was a visual learner.  (AR 491, 499.)

The assessment indicated that Plaintiff did not meet the eligibility criteria as a student with a specific learning disability, but he was assessed as a student with "other health impairment," based on direct observations and rating scales that indicated Plaintiff showed behavioral characteristics associated with ADHD combination presentation at school; the BASC-3 demonstrated Plaintiff was within the at-risk or clinically significant classification range for hyperactivity, aggression, conduct problems and learning problems; Plaintiff's off-task behaviors appeared to be related to low academics; and Plaintiff did not, at that time, have a current diagnosis of ADHD.  (AR 508–09.)  As a result of the assessment findings, it was recommended that Plaintiff enroll in the least restrictive environment, continue with Tier II program in the classroom, receive preferential seating in the classroom, guided practice and support in reading and mathematics, receive clear instructions/directions, prompt/redirections to remain on-task, and continue weekly monitoring.  (AR 510.)

### c.  May 2018 Individualized Education Program

Plaintiff's May 2018 IEP was completed when Plaintiff was 8 years old.  (AR 271–87.) The IEP again noted Plaintiff's strengths were remembering things and being social with everyone; his interests pertained to action figures and robots; and concerns involved Plaintiff playing by himself and getting frustrated easily.  (AR 272.)  It was noted that Plaintiff's absences and tardies had steadily decreased each year from 2015 through 2018.  Plaintiff tested in the high

average range of cognitive functioning; there were no concerns in the area of communication; his fine motor skills were age-appropriate; he passed his hearing and vision tests; the only medication he took was for allergies; and there were no concerns in the area of self-care/independent living. Plaintiff could complete 2-digit addition and 2-digit subtraction with regrouping with 100% accuracy.  As to social/emotional/behavioral functioning, Plaintiff was assessed as sweet, friendly and energetic, on-task 90% of the time, and remained on task at the beginning of the assessment. Classroom observations indicated Plaintiff was on task the majority of the time; was very compliant; and responded well to prompts and redirection.  While parents and teachers noted some concerns in the areas of hyperactivity and attention, the examiner did not notice any concerns related to Plaintiff's behavior.

Plaintiff's writing was legible and age-appropriate, but became large and messy when Plaintiff rushed; his writing using correct punctuation and capitalization was assessed to be 40% accurate; his reading comprehension was at 84% accuracy; he was noted to be able to read but had difficulty staying on task and completing assignments without redirecting; he showed improvement in reading from 18 correct words per minute the prior year to 47 correct words per minute.  However, it was noted Plaintiff needed to improve his reading fluency skills and writing. (AR 273.)

Plaintiff's IEP focused on improving Plaintiff's reading and writing abilities.  (AR 274.) His accommodations included: sitting at the front of the room near the teacher, being praised for specific behavior, receiving directions in a variety of ways, being placed in small group testing accommodations, and receiving modified work and homework as needed, use of highlighters, and increased verbal response times.  Pursuant to his IEP, Plaintiff would spend 94% of his time in the general education classroom setting and the rest of the time (120 minutes per week) receiving specialized academic instruction in the Learning Center; he would take general physical education.  (AR 271, 276–77.)  Plaintiff was not deemed eligible for extended school year ("ESY") services.  (AR 278.)  He did not require special transportation.  (AR 271.)

**d.      April 2019 Individualized Education Program**

Plaintiff's April 2019 IEP (annual review) was completed at age 9 years, 2 months, while

in the third grade, by the Greenfield Union Elementary School District, in connection with the Clinica Sierra Vista Behavioral agency. (AR 437–53.) Plaintiff's psychologist reported Plaintiff was doing well overall with the "check in check out program" ("CICO")—that "the improvement was immediate;" and he had consistently met his goals. (AR 438, 447.)

Plaintiff's teacher reported Plaintiff was showing "such great growth;" his behavior changed dramatically, he was no longer "hands-on" but very respectful; reading at a beginning level; math scores had increased; participation had increased; and he could do well when he attempted the work. (AR 447.) She also reported she would like to see Plaintiff put effort forth on all tests and assignments, learn more skills, and gain greater confidence. Specifically, in regard to how Plaintiff's condition affected his involvement and progress in school, Plaintiff's teacher reported Plaintiff qualified for specialized academic services under the category of "other health impairment. He require[d] specialized academic instruction in small groups in order to be successful in the general education classroom to access core curriculum." (AR 438.)

Plaintiff's special education teacher reported Plaintiff was responsive in class and did a great job advocating for behavior that he knew was right; he was kind to the other students and participated well; he met his fluency and writing goals. (AR 447.)

The IEP reviewers set goals with respect to reading and multiplying. Plaintiff was to spend 88% of his time in general education, with the remainder in special study (primary specialized academic instruction) for a total of 240 minutes per week. (AR 443–44.) It provided for the following accommodations: preferential seating (near the teacher, at the front of the room), verbal praise for specific behavior, additional breaks, directions given in a variety of ways, modified work/homework when needed, increased verbal response time, simplified test directions, and testing in small groups, as needed. (AR 441–42, 447.)

**e.    May 2020 Individualized Education Program**

Plaintiff's May 2020 IEP (annual review) was completed when he was 10 years, 4 months old, and in the fourth grade by Greenfield Union Elementary School District in connection with the Clinica Sierra Vista Behavioral agency. (AR 423–36.) The IEP report indicates Plaintiff was improving with reading, was willing to work independently, was interested in roller-skating and

drawing portraits.  (AR 424.)  The content of his writing was deemed strong.  (AR 425.) Plaintiff's teacher reported Plaintiff was very polite and well-liked by his peers; he made many friends that year; he loved to volunteer in class; and he was more outgoing in the Learning Center.  (AR 424.)

Plaintiff's teacher reported he demonstrated difficulty in finding the right words at times when trying to speak in complete sentences; he was performing below grade level with reading and writing—spelling and punctuation were noted to be the main writing areas in need of continued development—but Plaintiff benefitted from extra support; he needed extra supports including modeling, reteaching, and small group pull back; and occasionally he got frustrated with peers and yelled at them during partner work, but he was noted to improve in this area throughout the year.  (AR 425–25.)  His teacher noted that partnering with a quieter student helped Plaintiff avoid getting frustrated.  (AR 424.)  Occasionally, Plaintiff demonstrated task avoidance behaviors such as acting sick, but he was able to complete assignments with kindness and firm expectations.

Plaintiff tested at mid-second grade level on the STAR reading assessment; and he placed in the high average ranges of ability for cognitive functioning testing.  The IEP indicates self-care/independent living and motor abilities and/or recreation/leisure were not areas of concern. The IEP again noted Plaintiff did not take any medications except for his allergies at school; his mother reported Plaintiff has a prescription for Adderall, which he took prior to the school day. (AR 434.)   The IEP noted Plaintiff was seeing a psychiatrist at Clinica Sierra Vista to discuss work with emotional concerns like his worries about being overweight.  (AR 424.)

Plaintiff's special education teacher reported Plaintiff showed a lot of growth over the year with reading fluency (at a third-grade level), improved with his multiplication facts, and had a positive attitude.  (AR 434.)

The IEP set goals to continue to improve Plaintiff's reading, writing, and math abilities. (AR 425–27.)  Plaintiff was to spend 88% of his time in general education, with the caveat that removal from general education only occur "when the nature or severity of the educational needs are such that education in general classes with supplementary aids and services cannot be

achieved satisfactorily."  (AR 430.)  Plaintiff would receive primary specialized academic instruction in a separate class 225 minutes per week (a decrease in time from the prior year).  (AR 431.)  It provided for special accommodations such as a seat at the front of the room near the teacher, extended time to complete assignments, extended time on tests with simplified test directions, and conducting testing in small groups and/or the resource room (a separate setting) as needed; and permitted Plaintiff to take breaks and use scratch paper and a multiplication table.  (AR 428–29.)  Teachers were directed to praise Plaintiff when he was on task and speaking politely, give directions in a variety of ways, frequently check for understanding, orally present questions or items, read answer choices aloud, modify classwork and/or homework, and provide verbal encouragement.  (AR 428.)

3.     Dr. Persel's Questionnaire

On December 13, 2019, school psychologist Dr. Kaleigh Persel completed a check-the-box teacher questionnaire for Plaintiff.  (AR 399–406.)  At the time of completion, Dr. Persel had known Plaintiff for one year; Dr. Persel would see Plaintiff at the beginning of the day, at recess or lunches, and various times of the day.  (AR 399.)  She indicated Plaintiff had an unusual degree of absenteeism: two illness dates, one tardy, sixteen lates, and seven unexcused absences.  She reported Plaintiff was receiving special education services of 240 minutes weekly in the learning center.

Dr. Persel indicated Plaintiff had functional problems in all 10 identified categories of the domain for "acquiring and using information."  (AR 400.)  On a scale of 1 ("no problem") to 5 ("a very serious problem"), she checked 3 ("an obvious problem") for the domains of: (1) comprehending oral instructions; (2) understanding school and content vocabulary; (3) reading and comprehending written material; (5) understanding and participating in class discussions; (6) providing organized oral explanations and adequate descriptions; (7) expressing ideas in written form; (8) learning new material; (9) recalling and applying previously learned material; and (10) applying problem solving skills in class discussions.  She checked 4 ("a serious problem") for domain (4): comprehending and doing math problems.  Dr. Persel stated "[Plaintiff] receives specialized academic instruction.       IEP goals address foundational reading skills and

21

1 | multiplication facts."

2 |      As to the "attending and completing tasks" domain, Dr. Persel indicated Plaintiff had no
3 | problems in (2) sustaining attention during play/sports activities; and (5) carrying out single-step
4 | instructions.  (AR 401.)  On the same 1–5 scale, she indicated Plaintiff had "a slight problem" in
5 | the categories of: (1) paying attention when spoken to directly; (7) waiting to take turns; (8)
6 | changing from one activity to another without being disruptive; (9) organizing his own things or
7 | school materials; (12) working without distracting self or others; and (13) working at reasonable
8 | pace/finishing on time.  Dr. Persel indicated Plaintiff has "an obvious problem" in: (3) focusing
9 | long enough to finish assigned activity or task; (4) refocusing to task when necessary; (6) carrying
10 | out multi-step instructions; (10) completing class/homework assignments; and (11) completing
11 | work accurately without careless mistakes.  She noted Plaintiff "has a history of off-task behavior
12 | in the classroom that has disrupted the learning of himself and others."

13 |      As to the "interacting and relating with others" domain, Dr. Persel indicated Plaintiff had
14 | no problem with making and keeping friends; relating experiences and telling stories; introducing
15 | and maintaining relevant and appropriate topics of conversation; and interpreting meaning of
16 | facial expression, body language, hints, and sarcasm.  (AR 402.) The nine other categories under
17 | this domain were ranked as a 2 ("a slight problem) on the 1–5 scale.  Dr. Persel noted Plaintiff
18 | had made a lot of progress in the last year; and had benefitted from a "check in check out" in the
19 | past targeting his ability to get along with peers, following directions from an adult, and
20 | compliance in the classroom, and had "made improvements."  (AR 402–03.)

21 |      Dr. Persel opined Plaintiff had no problems in the "moving about and manipulating
22 | objects" domain.  (AR 403.)

23 |      As to the "caring for himself" domain, Dr. Persel indicated Plaintiff's impairments
24 | resulting in limitations ranging from "no problem" to "a slight problem" in ten different
25 | categories under this domain.  (AR 404.)  She again noted Plaintiff had made improvements in
26 | these categories, whereas he previously struggled with anger during unstructured times.

27 |      Dr. Persel also noted on the questionnaire that Plaintiff did not take medications for his
28 | medical impairments, and was only affected at school by his ADHD, which manifested in his

ability to maintain attention in the classroom.   (AR 405.)   Finally, on a section of the questionnaire in which Dr. Persel had an entire page to write "additional comments" in continuation or support of her previous findings, Dr. Persel left the section blank.  (AR 406.)

       4.     Dr. Venter's Psychological Consult Examination and Testing Results

On January 7, 2017, Consulting Examining Doctor Henry J. Venter, Ph.D. conducted a psychological evaluation of Plaintiff.  (AR 518–25.)  Dr. Venter's evaluation was not based on prior medical records, but his own examination and administration of the Vineland Adaptive Behavior Scale – Second Edition ("VABS II") and Wechsler Intelligence Scale for Children – Fourth Edition ("WISC IV") tests.[8]  (AR 518.)  Plaintiff, six years old at the time (first grade), was observed to be adequately dressed and groomed and was able to relate with Dr. Venter and participate in the testing.  Plaintiff was accompanied by his mother, who brought Plaintiff on time to the appointment and was deemed a reliable historian.

Dr. Venter noted Plaintiff's social interaction was routinely appropriate; his overall social-emotional and behavioral functioning was age-appropriate; and he had friends with whom he had a fair relationship.  (AR 520.)  Mental status examination revealed Plaintiff was cooperative; his behavior was appropriate to the setting; impulse control was fair; he was somewhat hyperactive during the evaluation; he separated easily from his mother; he was oriented to time, place, and person; he comprehended most aspects of the evaluation; his verbal response time was adequate; his speech was not dysarthric and his tone was adequately modulated; Dr. Venter understood 100% of Plaintiff's verbal productions.  Dr. Venter observed Plaintiff's receptive and expressive language was normal; his speech was spontaneous, without articulation defect, and there was no evidence of psychomotor slowing; mood was euthymic; affect was normal and within normal limits; immediate memory was intact; general fund of knowledge was fair; insight was fair and age appropriate; and judgement was intact, normal, and age appropriate.  Dr. Venter noted Plaintiff was able to identify, understand, and weigh the alternatives, understand the

---

[8] The WISC-IV assesses intellectual ability, including verbal and nonverbal functioning.  The VABS-II is one of the various assessment tools that can be used to help diagnose and evaluate the special needs of students.  The focus is the measurement of the adaptive behaviors, including the ability to cope with environmental changes, to learn new everyday skills and to demonstrate independence.  Its primary purpose is to assess the social abilities of an individual by measuring communication, daily living skills, socialization, and maladaptive behavior.

consequences of choices, and make a reasonable decision.  (AR 520–21.)

Dr. Venter opined Plaintiff's intellectual functioning was in the low average range of intelligence.  (AR 520.)   He determined Plaintiff's concentration and attention span were noticeably impaired; Plaintiff followed instructions appropriately and was motivated; however, he was observed to interrupt himself during coding, become tired and need encouragement and redirection to continue.

As to the WISC-IV test results, Plaintiff scored IQs of 98 on verbal comprehension ("average"); 96 on perceptual reasoning ("average"); 88 on working memory ("low average"); and 78 on processing speed ("borderline"); resulting in a FSIQ of 88.  (AR 521.)  Plaintiff's FSIQ placed him in the lower 50% of the overall population, and he performed better than 21% of his age group.  Dr. Venter concluded the test results were indicative of a learning disorder and correlated with Plaintiff's reported performance in school.  (AR 522.)

As to the VABS-II test results, Plaintiff scored a 90 in communication, 90 in daily living skills, and 95 in socialization, all characterized as "adequate" adaptive levels.   Dr. Venter concluded Plaintiff functioned at the level of his age group in regard to all the main domains of the test; his personal behavior and domestic interaction showed independence and competence in all basic tasks of hygiene; interpersonal relationships and various coping skills were also adequately developed; Plaintiff dealt adequately with environmental changes, learning new everyday skills and demonstrated independence.   Thus, Dr. Venter concluded Plaintiff had adequate adaptive behavior with age-appropriate personal and social skills and could interact effectively with his environment.

As a result of the tests, Dr. Venter diagnosed Plaintiff with a learning disorder, NOS (not otherwise specified), based on his finding that Plaintiff had a combination of reading, writing, and/or math difficulties that suggested deficits in auditory processing, visual processing, speed of processing, or any combination of those, which made it difficult to learn information as efficiently as a student without a learning disability.  (AR 523.)  Dr. Venter further assessed Plaintiff did not present with deficits due to his diagnosable psychological disorder that would keep him from participating and progressing in the general education curriculum.

Dr. Venter opined Plaintiff's ability to understand and respond to questions in an age-appropriate manner was unimpaired; his ability to communicate was unimpaired; his social skills were unimpaired; his ability to focus attention and concentrate was moderately impaired with more than slight limitations in this area; and his ability to perform activities of self-care at an age-appropriate level was mildly impaired with slight limitations in this area.  (AR 524–25.)

     5.    <u>Treatment Notes from Kern Behavior Health and Recovery Services</u>

     **a.**    **AMFT Grewal's September 13, 2018 Treating Source Statement**

At age 8, Plaintiff was assessed by Shaundeep Grewal, AMFT (Associate Marriage Family Therapist) at Kern Behavioral Health and Recovery Services.  (AR 454–73, 545–49, 551–70, 660–80.)  Plaintiff was not on any psychotropic medications at that time.  (AR 455–56.)  A mental status examination yielded pleasant, cooperative attitude; anxious and unremarkable mood; appropriate and congruent affect; normal and spontaneous speech; unremarkable thought content; and normal cognitive functions.  (AR 464, 466–67.)

AMFT Grewal observed symptoms of lack of focus, distractibility, hyperactivity, inattentiveness, anger, aggression, defiance, poor social skills, and isolative behaviors, which AMFT Grewal opined impaired Plaintiff's ability to function independently, socially, and academically.  (AR 454, 467.)  AMFT Grewal assessed Plaintiff for ADHD, combined type, with "severe" symptoms.  (AR 454–55, 467–68.)  AMFT Grewal opined Plaintiff's impairments caused a moderate limitation in the area of independent living, and severe limitations in the area of social relationships and education, requiring level 3 service (of four levels) for the next 6–12 months.  (AR 470.)  He assessed Plaintiff with a "psych high" UNCOPE screening score, and recommended individual and family therapy, individual rehab and a psychiatric evaluation/medication support, and referral to a community based, extracurricular activity program such as the Boys and Girls Club.  (AR 471.)

     **b.**    **December 2018 Annual Mental Health Reassessment**

Plaintiff underwent an annual mental health reassessment with AMFT Marlina Giselle Aran at the Kern Behavioral Health and Recovery Services on December 21, 2018.  (AR 632–45, 681–94.)  The assessment indicates all background information was provided by Plaintiff's

1    mother.  (AR 632.)

2          The mental status examination showed Plaintiff was responsive, with appropriate attire,

3    pleasant and cooperative attitude, euthymic mood, normal affect and speech; his motor activity,

4    behavior, thought process, and thought content were unremarkable; and he would conceal his

5    eyes or avert his gaze.  (AR 638, 640.)  Plaintiff was appropriately oriented but demonstrated

6    impaired ability to concentrate and pay attention; his immediate and recent memory was deemed

7    fair, while his long-term memory was found to be poor; insight was fair; judgment was impaired.

8    (AR 640.)  Plaintiff's intelligence was deemed "average."  Plaintiff was assessed with ADHD and

9    PTSD, and ruled out neurodevelopmental disorder, with trauma relating to being bullied and his

10   father being incarcerated.  (AR 642.)  AMFT Aran opined Plaintiff required level 3 (of four

11   levels) service.  (AR 644.)  It was again recommend that Plaintiff receive individual therapy,

12   family therapy, individual rehab, and psychiatric evaluation and medication support for 8–12

13   months.

14          c.      February 2019 Follow Up Assessment

15          On February 13, 2019, Plaintiff underwent a psychiatric evaluation with Dr. Luigi Alberto

16   Dulanto, M.D.  (AR 474–85, 646–56, 695–706.)  A mental status examination showed Plaintiff

17   was responsive; had appropriate appearance; was pleasant and cooperative; and displayed

18   unremarkable behavior, thought process, and thought content, euthymic appropriate mood, and

19   normal affect and speech.  (AR 477, 479.)  Plaintiff showed some impaired ability in

20   concentration and judgment, was inattentive, and demonstrated fair insight and memory.  (AR

21   480.)  He was assessed with ADHD and PTSD, with trauma from his father's incarceration and

22   being bullied; neurodevelopmental disorder was ruled out.  (AR 481.)  Prognosis was fair.  (AR

23   484.)  Dr. Dulanto recommended a treatment plan consisting of medication and psychosocial

24   intervention.  Dr. Dulanto prescribed Adderall for Plaintiff's ADHD.  (AR 483–84.)

25          d.      Mental Health Reassessment July 2020

26          Plaintiff underwent another annual mental health reassessment on July 15, 2020, with

27   AMFTs Gregory Ragle and Jeannete Leslie Luna.  (AR 840–54.)  No changes were reported from

28   Plaintiff's December 18, 2018 assessment in terms of impairments, but Plaintiff's mother did

indicate improvement since that last date.  (AR 841–42, 845.)  No mental examination was administered, due to COVID.  AMFT Ragle assessed Plaintiff with ADHD and ruled out neurodevelopmental disorder.

     **e.**     **Follow Up Mental Status Examinations**

     On April 26, 2019, Plaintiff's mother reported he made improvements with medication but the Adderall was not lasting long enough and Plaintiff was still experiencing sleep issues.  (AR 858.)  However, she also reported Plaintiff was doing much better, that his academic performance was improved, and Plaintiff was no longer interrupting his classmates.  Plaintiff reported no problems, and appeared cooperative.

     On May 30, 2019, Plaintiff's mother reported she was pleased with the results of medication and therapy.  (Id.)

     On August 7, 2019, Plaintiff's mother reported Plaintiff was having difficulty sleeping, but no other side effects.  (AR 857.)  She also noted Plaintiff's medications were helping with his ADHD symptoms and teachers were giving positive feedback.  Medical staff agreed to switch the nighttime medication from clonidine to Trazodone.

     On October 23, 2019, Plaintiff's mother reported the medications were not controlling Plaintiff's symptoms, but agreed to increase his Trazodone and Adderall dosages.  (Id.)

     Thereafter, it was reported that Plaintiff's ADHD symptoms were "well controlled" with medications, that he had no side effects with the Adderall, no issues with appetite and sleep, and Plaintiff's mother was agreeable to continue Plaintiff's current medications.  (See AR 857 (Jan. 23, 2020); AR 857 (Apr. 1, 2020); AR 856 (May 27, 2020); AR 856 (Jun. 24, 2020); AR 856 (Jul. 16, 2020); AR 855 (Sept. 10, 2020); AR 855 (Nov. 16, 2020); AR 857–65 (Nov. 19, 2020, normal mental exam); AR 872 (Jan. 29, 2021, ADHD symptoms well-controlled if on meds).)

     6.     Treatment Notes from San Michael Pediatrics & Valley Children's Medical Group

     Plaintiff was treated at San Michael Pediatrics and Valley Children's Medical Group from time to time for various non-mental health-related complaints.  (AR 708–818; see also, e.g., AR 708 (sore throat and stomach pain); AR 721 (cough and wheezing).)  During these visits, Plaintiff was generally reported to have normal examinations.  (See, e.g., AR 790 (Nov. 7, 2017, normal

affect and mood); AR 787 (Mar. 6, 2018, normal affect and mood); AR 708–10 (Apr. 17, 2018, normal neurological exam); AR 711–14 (Jul. 23, 2018, same); AR 715–17 (Aug 30, 2018, same); AR 718–20 (Jan. 2, 2019, same); AR 721–23 (Mar. 15, 2019, same); AR 724–27 (Nov. 6, 2019, same); AR 728–30 (Mar. 17, 2020, same); AR 731–37 (Mar. 26, 2020, same).)  In July 2018, a developmental assessment noted Plaintiff had normal eye contact, could tie his shoelace, write his own name, and draw a triangle.  (AR 712.)  In January 2019, Plaintiff was purportedly referred to be evaluated for autism (AR 718–20); however, there are no records indicated this ever occurred, and autism is not mentioned in a single other medical note in Plaintiff's extensive longitudinal record.  Rather, all other examination results were normal.

7.   Prior Administrative Medical Findings[9]

Dr. Dara Goosby, PsyD assessed Plaintiff's records through February 6, 2017, and issued a finding of nondisability at the initial level of review.  (AR 107–12.)  Plaintiff was assessed with mental impairment learning disorder, secondary to his asthma.  (AR 108.)  He was assessed to have a "marked" limitation in the domain of and "health and physical well-being," "less than marked" limitations in the domains of "acquiring and using information," "attending and completing tasks," "moving about and manipulating objects," and "no limitation" with respect to the domains of "interacting and relating with others," and "caring for yourself."  (AR 108–09.)  Dr. K. Econome, M.D. reviewed Plaintiff's records through August 7, 2018, and issued a similar finding of nondisability.  (AR 115–124.)

At the reconsideration level, Dr. Deborah G. Mishek, M.D. reviewed Plaintiff's records through October 30, 2018, and issued a finding of nondisability.  (AR 128–41.)  Plaintiff was assessed with a primary impairment of ADHD and secondary impairment learning disorder.  (AR

---

[9] Under the applicable regulations for evaluating medical evidence, State agency medical and psychological consultants do not provide "medical opinions."  Rather, the new regulations use the term "prior administrative medical finding" to refer to findings "about a medical issue" made by the State agency medical and psychological consultants who review a claimant's medical file at the initial and reconsideration levels of the administrative process.  20 C.F.R. § 404.1513(a)(5) (listing examples of types of findings, such as the existence/severity of impairments or a claimant's RFC).  ALJs, however, must consider this evidence under the same rules that apply to "medical opinions" because these "consultants are highly qualified and experts in Social Security disability evaluation."  20 C.F.R. § 404.1513(b)(1); see also 20 C.F.R. §§ 404.1513(a) (identifying "medical opinions" and "prior administrative medical findings" as categories of evidence an ALJ must consider), (a)(2) (defining "medical opinions").

136.)  He was assessed to have "less than marked" limitations in the domains of "acquiring and using information," and "attending and completing tasks," and no limitations with respect to the domains of "interacting and relating with others," "moving about and manipulating objects," "caring for yourself," and "health and physical well-being.  (AR 136–38.)

8.     Dr. Farnsworth's Expert Medical Testimony

Objective medical expert, Dr. Kristy Farnsworth, PhD testified that Plaintiff had multiple impairments resulting in limitations in functioning, but not to a significant extent, considering his school records.  (AR 92–97.)  More specifically, Dr. Farnsworth testified that Plaintiff has a learning disability and ADHD, which both fall under neurodevelopmental disorders under Listing 112.11.  (AR 93 (citing AR 516–26, 851).)  Dr. Farnsworth noted Plaintiff's records indicate he had "a very good and positive response" to his medications and that he has been compliant with the medications.  (AR 93 (citing AR 872–96).)

As to the B criteria, Dr. Farnsworth opined Plaintiff does not meet or equal a listing, but noted Plaintiff has a moderate limitation in the areas of "understanding, remembering, and applying information" and "concentrating, persisting, or maintaining pace," and no limitations in the areas of "ability to interact with others" and "ability to adapt or manage oneself."  (AR 93–94.)

As to the childhood domains, Dr. Farnsworth opined that Plaintiff has a "less than marked" degree of limitation in the domain of "acquiring and using information," based on testing and school records.  (AR 94–95 (citing AR 516–26).)  She opined Plaintiff has a "less than marked" degree of limitation in the domain of "attending and completing tasks," based on teacher questionnaires that show Plaintiff has some difficulties in that area and below-average grades, but that also showed drastic improvement in behavior around April 2019 (*i.e.,* when Plaintiff started taking medication for his ADHD).  (AR 95 (citing AR 270–92, 402, 447).)  Dr. Farnsworth opined Plaintiff has a "less than marked" degree of limitation in the domain of "interacting and relating with others," based on reports that Plaintiff was "well-liked" in school, but also a teacher report that Plaintiff had some difficulties interacting with peers.  (Id. (citing AR 402).)  Dr. Farnsworth opined Plaintiff has no limitations in the domain of "moving about and manipulating

objects," because she did not see any records to support an impairment in this domain.  (Id.)  Dr. Farnsworth opined Plaintiff has a "less than marked" degree of limitation in the domain of "caring for yourself," based on Plaintiff's teacher's observations from 2015.  (Id. (citing AR 396–406).)   Finally, Dr. Farnsworth declined to opine as to the domain of "health and physical wellbeing," deferring instead to the other medical doctors who reviewed Plaintiff's physical impairments.  (AR 95–96.)

## D.   Analysis

### 1.   The ALJ Sufficiently Addressed All of the Relevant Evidence of Record

With respect to Plaintiff's contention that the ALJ ignored relevant evidence to reach a nondisability determination, the Court finds such contention is belied by the record.  To the contrary, it appears the ALJ referenced and considered the same evidence Plaintiff cites to and relies upon in his briefing.  (See, generally, AR 31–36.)  To this point, the Court additionally notes Plaintiff's file is replete with duplicate records which, at times, appears to affect Plaintiff's perception of which files or records the ALJ considered or did not cite to in her decision.  For example, the September 13, 2018 medical records and opinion may be found in the administrative record at AR 454–73, AR 545–49, AR 551–70, and AR 660–80.  This implicates Exhibits 23E (which the ALJ repeatedly expressly cites to in her decision, see AR 29, 30, 34, 35, 36), as well as Exhibits 3F, 4F (see AR 33), 5F (see AR 33), and 11F.  Furthermore, it is clear from the ALJ's discussion of certain school records and test results that she is referencing records cited to by Plaintiff, despite the fact that she does not expressly cite to these records by their exhibit number or pagination in the administrative record.  See Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (noting the Ninth Circuit does not require an ALJ to "perform a line-by-line exegesis of the claimant's testimony" or "draft dissertations when denying benefits."); see also Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (citing SSR 96-8p) ("[p]reparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); SSR 09-1p, at *3 (stating an ALJ is not required to discuss all of the considerations in their determinations and decisions, but must only provide sufficient detail so that a subsequent reviewer can understand how the ALJ made her findings);

1    Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1103 (9th Cir. 2014) ("[T]he ALJ's

2    analysis need not be extensive."); Drummer v. Kijakazi, No. 21-35710, 2022 WL 2953703, at *1

3    n.3 (9th Cir. Jul. 26, 2022) (citing Howard, 341 F.3d at 1012 ("[T]he ALJ does not need to

4    discuss every piece of [medical] evidence.") (internal quotations omitted))).

5          Regardless, the face of the ALJ's decision demonstrates the ALJ considered Dr. Persel's

6    questionnaire (AR 34, 36 (citing AR 396–406)); Dr. Venter's consultation examination and

7    testing results (AR 29, 30, 32, 35 (citing AR 516–26)); various school records, inclusive of the

8    March 2018 assessment documenting Plaintiff's testing results (see AR 31, 32, 33, 35 (citing AR

9    92–97, 270–92, 396–406, 423–85)) and Plaintiff's May 2020 IEP (AR 34, 35, 36 (citing AR 423–

10    36)); reports from Plaintiff's mother (AR 29, 30, 31, 32, 33, 35–36 (citing AR 302–13, 486, 872–

11    96, 708–38, 840–41)); and treatment notes from Kern Behavior Health and Recovery Services,

12    including those from September and December 2018 (AR 29, 30, 34, 35, 36 (citing AR 423–85,

13    545–70, 591–613, 661–738)).

14          2.    The ALJ's Evaluation of the Symptom Testimony and Medical Opinions

15                 Identified by Plaintiff is Supported by Substantial Evidence

16          With respect to Plaintiff's argument that the ALJ improperly mischaracterized or

17    otherwise "failed to consider" (perhaps by improperly weighting) certain symptom allegations or

18    medical opinions, the Court finds the ALJ's evaluation of the opinion evidence and testimony was

19    properly support by substantial evidence, as follows.

20          **a.**    **The ALJ Properly Discounted Plaintiff's Mother's Testimony**

21          The ALJ discounted Plaintiff's mother's reported symptomology to some extent, on the

22    basis that it was inconsistent with the longitudinal record showing substantial improvement with

23    medication and special educational accommodations, Dr. Farnsworth's objective expert medical

24    opinion and testimony as to the severity of Plaintiff's limitations, and the test results from the

25    examinations administered by the consulting physician, Dr. Venter.  (See AR 32, 35–36 (citing

26    AR 270–92, 396–406, 423–85, 872–96).)  Further, the ALJ noted Plaintiff's mother's reports

27    were, at times, internally inconsistent.  For example, Plaintiff's motion reported at times that he

28    has multiple friends but at other times that he has no friends.  (AR 35.)  Thus, the ALJ determined

the testimony and report of Plaintiff's mother was not persuasive as to the extent of Plaintiff's limitations.  (AR 35–36.)

The Court finds the ALJ's reasons for discounting Plaintiff's mother's allegations were properly supported by substantial evidence.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1160–61 (9th Cir. 2008) (contradiction with medical record is a sufficient basis to discount allegations); Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (internal inconsistencies in testimony may support adverse credibility determination).  Further, apart from his mistaken contention that the ALJ did not address or somehow mischaracterized the mother's allegations, Plaintiff does not challenge the ALJ's actual discounting of her testimony, thus effectively waiving such challenge.  Lewis, 236 F.3d at 517 n.13; Indep. Towers of Wash., 350 F.3d at 929.

### b.      The ALJ Properly Evaluated Dr. Persel's Questionnaire Opinion

The ALJ found Dr. Persel's questionnaire to be persuasive with respect to most of the domains, as Plaintiff's identified limitations were supported by his standardized testing records, his need for academic supports, and his ongoing IEP reports.  (AR 36 (citing AR 270–92, 23).)  However, the ALJ did not find Dr. Persel's opinion to be persuasive with respect to the social limitations; these the ALJ found were not fully supported by the record, because Plaintiff's school reports indicate good interactions with peers as well as teachers overall.  The ALJ also noted Plaintiff's treating notes from his psychiatrist have not been consistent for significant mood disturbances or misbehavior on treating evaluations.  (Id. (citing AR 872–96).)

The Court finds the ALJ adequately explained how she considered the supportability and consistency factors relative to Dr. Persel's medical opinion, and her analysis is supported by substantial evidence in the record.  Ford, 950 F.3d at 1154; Martinez v. Colvin, No. 1:14-CV-1070-SMS, 2015 WL 5231973, at *3 (E.D. Cal. Sept. 8, 2015).  That is, the ALJ pointed to internal inconsistencies within Dr. Persel's own reporting which undermined her opinions as to the more severe domain limitations.  See Flowers v. Colvin, No. 3:16-CV-05025 JRC, 2016 WL 4120048, at *3 (W.D. Wash. Aug. 3, 2016) (ALJ may discount an unexplained check-the-box form opinion that is unsupported or inconsistent with the treatment records from that medical

provider).  The ALJ also discussed evidence in the longitudinal record with which Dr. Persel's opinions were inconsistent.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (inconsistency with the majority of objective medical evidence is an appropriate reason for rejecting a physician's opinion).  Finally, the Court notes Dr. Persel's check-the-box form questionnaire indicated several opinions for which Dr. Persel did not provide additional supporting information.  As the Ninth Circuit has noted, an ALJ may permissibly reject opinions where "they [are] check-off reports that do not contain any explanation of the basis of their conclusions."  Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996).  Plaintiff argues the ALJ failed to address Dr. Persel's opinion (which is clearly belied by the above discussion); however, he does not otherwise challenge the ALJ's evaluation of Dr. Persel's opinion or the weight she accorded it.  To that extent, Plaintiff's argument is waived.  Lewis, 236 F.3d at 517 n.13; Indep. Towers of Wash., 350 F.3d at 929.

### c.        The ALJ Properly Evaluated Dr. Venter's Opinion

The ALJ found Dr. Venter's opinion was persuasive with respect to the limitations in understanding and remembering information, concentrating, and persisting, and socializing, as these findings were deemed supported by Dr. Venter's examination findings and observations.  (AR 35.)  The findings were also consistent with ongoing standardized test results and school reports noting Plaintiff's below-grade level results.  (Id. (citing AR 270–92, 396–406, 423–85).)  However, the ALJ found the opinion was not persuasive as to the "no limitation" in understanding and responding to questions because it was not supported or consistent with the overall record, particularly Plaintiff's need for academic accommodations.  (Id. (citing AR 270–92, 396–406, 423–85).)

The Court finds the ALJ adequately explained how she considered the supportability and consistency factors relative to Dr. Venter's medical opinion, and her analysis is supported by substantial evidence in the record.  Ford, 950 F.3d at 1154; Martinez V., 2021 WL 1947238, at *3.

///

///

3. <u>The ALJ's Evaluation of the Medical Opinions and Other Evidence Not Addressed by Plaintiff is Supported by Substantial Evidence</u>

In addition to the aforementioned evidence, the ALJ also considered the testimony of impartial medical expert Kristy Farnsworth, Ph.D., (AR 32, 35); additional school reports and IEPs (AR 29, 30, 32–33, 34, 35, 36); additional mental health records (AR 29, 30, 33, 36); and the prior administrative medical findings (AR 35)—all additional substantial evidence in the record which Plaintiff does not address, but which support the ALJ's functional equivalence analysis and ultimate determination of nondisability.

a.   **Prior Administrative Medical Findings**

For example, the ALJ considered and evaluated the prior administrative medical findings. The ALJ found the prior administrative medical findings were not persuasive with respect to the domain findings because the overall record indicated greater limitations than the "no limitation" opinions the state doctors provided, such as Plaintiff's history of anger problems and personal care reported by his mother, frustration reported by his teachers, and multiple absences in the school records.  (AR 35 (citing AR 270–92, 396–406, 423–36).)  However, the ALJ found the state doctor's findings of limitations were persuasive, as they are supported by and consistent with the overall record—particularly Dr. Venter's findings and school reports of ongoing problems with below-grade level academic performance and need for academic support.  (<u>Id.</u>)

Plaintiff does not address or challenge the ALJ's evaluation of the state medical opinions (and has therefore waived such challenge).  <u>Lewis</u>, 236 F.3d at 517 n.13; <u>Indep. Towers of Wash.</u>, 350 F.3d at 929.  In any event, the ALJ's evaluation of this medical opinion evidence was properly supported by substantial evidence from the record and therefore proper.  <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008); <u>Batson</u>, 359 F.3d at 1195.

b.   **Medical Opinion of Dr. Farnsworth**

The ALJ also considered and evaluated the medical testimony and opinion of impartial medical expert Dr. Farnsworth.  The ALJ noted Dr. Farnsworth's testimony with respect to her findings on all of the domains except the third one ("interacting and relating with others") were persuasive, as the testimony was supported by and consistent with school records reporting

Plaintiff's below-grade-level functioning in school, cognitive testing results from his independent psychological consultative examination (Dr. Venter), and teacher reports. (AR 32, 35.) The ALJ noted Dr. Farnsworth also testified about the medical notes and reports showing Plaintiff's positive response to treatment, and she ultimately opined that Plaintiff exhibited no more than "less than marked" limitations in these domains in light of this improvement; the ALJ found this evidence also supported and was consistent with Dr. Farnsworth's opinion. (AR 35.)

The Court finds the ALJ adequately explained how she considered the supportability and consistency factors relative to Dr. Farnsworth's medical opinion, and her analysis is supported by substantial evidence in the record. Ford, 950 F.3d at 1154; Martinez V., 2021 WL 1947238, at *3. Plaintiff does not address Dr. Farnsworth's testimony, nor does he challenge the ALJ's evaluation of Dr. Farnsworth's expert medical opinion testimony. See Lewis, 236 F.3d at 517 n.13; Indep. Towers of Wash., 350 F.3d at 929.

4.     The ALJ's Functional Equivalence Analysis is Supported by Substantial Evidence

As noted, under the "whole child approach" for determining functional equivalence, the ALJ must consider all of the child's activities; "everything [the child does] at home, at school, and in [the] community"; the interactive and cumulative effects of all of Plaintiff's medically determinable impairments on his activities; and the type, extent, and frequency of help Plaintiff needs), R.S., 357 F. Supp. 3d at 1037; 20 C.F.R. § 416.926a(b), with respect to the aforementioned six domains. 20 C.F.R. §§ 416.926a(b)(1)(i)–(vi).

Here, the ALJ applied the "whole child" standard and determined Plaintiff had "less than marked" limitations in the domains of "acquiring and using information," "attending and completing tasks," "caring for yourself," and "health and physical well-being," and no limitations in the domains of "interacting and relating with others" and "moving about and manipulating objects." (AR 30–36.) Plaintiff only challenges the ALJ's determination with respect to the "acquiring and using information," "attending and completing tasks" domains. The Court finds the ALJ properly considered and evaluated the longitudinal record to complete the functional equivalence analysis.

As it relates to the "acquiring and using information" domain which Plaintiff challenges,

the ALJ noted Plaintiff's mother reported ongoing problems with age-appropriate learning (AR 302–13) and an independent psychological consultative examination (Dr. Venter) noted a full-scale IQ ("FSIQ") test in the low average range (AR 516–26).  The ALJ also considered Plaintiff's Individualized Education Plans ("IEP") and teacher notes reported that Plaintiff was reading at below grade-level even with ongoing assistance (AR 270–92, 326–35, 423–85), and that his math proficiency was below grade level.  For this reason, the ALJ assessed Plaintiff to have some degree of limitation.  Nevertheless, the ALJ did not find a greater severity was warranted because the longitudinal record reflects Plaintiff has shown improvement, and mental health treatment records do not consistently note problems with estimated intelligence or memory.  (AR 29 (citing AR 840–71, 872–96).)

Similarly, with respect to the "attending and completing tasks" domain, the ALJ acknowledged Plaintiff's mother's reports of problems with attention (AR 302–13), of being impulsive and disruptive, of not being able to manage online schooling without her supervision.  (See AR 29–30.)  The ALJ considered records showing Plaintiff was noted to exhibit hyperactive behavior on independent psychological consultative examination (Dr. Venter) with need for redirection and encouragement to finish testing (AR 516–26).  Further, the ALJ considered Plaintiff's school records indicating his need for academic accommodations due to his poor attention, as well as problems with effort (AR 270–92, 326–35, 423–85).  Because of these limitations, again, the ALJ concluded Plaintiff had some degree of functional limitation.  (AR 29.)  The ALJ concluded the limitation was not more severe, however, because the longitudinal record—including reports by Plaintiff's mother—demonstrated that medications and accommodations were effective in addressing Plaintiff's inattention issues; this is also reflected in Plaintiff's improved school records and teacher reports.  (AR 30.)

Importantly, in performing the functional equivalent analysis as to these domains, the ALJ considered the opinions of the prior administrative medical findings, and the expert opinion of Dr. Farnsworth, both of which opined Plaintiff's limitation was "less than marked" in the at-issue domains, and which the ALJ found to be persuasive.  Having determined the ALJ properly evaluated these medical opinions as persuasive based on substantial evidence in the record, the

1    Court notes it was proper for the ALJ to rely on such opinions in her functional equivalent
2    analysis.   Thus, on this record, the Court finds the ALJ reasonably interpreted the objective
3    medical and non-medical evidence and substantial evidence supports the ALJ's relevant findings.
4    Therefore, the ALJ's functional equivalence analysis was properly supported by substantial
5    evidence.  Howard, 341 F.3d at 1011.

6          Meanwhile, it is particularly problematic to Plaintiff's argument that Plaintiff relies on
7    certain allegations by his mother, without acknowledging or challenging the fact that the ALJ
8    discounted such allegations as inconsistent with the longitudinal record, as well as older medical
9    records showing the most extreme examples of limitations resulting from his impairments, while
10   failing to acknowledge more recent records which demonstrate adherence to medications and
11   Plaintiff's treatment plan resulted in improved conditions.  Nor does Plaintiff address or challenge
12   much of the ALJ's consideration of the medical opinion evidence, such as that of Dr. Farnsworth
13   and the state physicians.  Plaintiff's argument thus fails to consider the entire longitudinal record,
14   as the ALJ did.

15         Plaintiff's argument that the ALJ "mischaracterized the record" is equally unavailing.  As
16   noted, the ALJ not only considered the same reports and opinions in the record to which Plaintiff
17   cites, but also substantial evidence—such as Dr. Farnsworth's "persuasive" expert testimony—
18   which Plaintiff does not address.  Furthermore, the ALJ's finding that the effects of Plaintiff's
19   impairments were noted to have improved with treatment (counseling and medications) was
20   supported by substantial evidence.  (See AR 32, 33, 34, 36 (citing AR 396–406, 855–60, 872–
21   96)); Woods v. Kijakazi (Woods II), 32 F.4th 785, 792 (9th Cir. 2022); Tommasetti, 533 F.3d at
22   1041 (medical records constitute substantial evidence); see also Warre v. Comm'r of Soc. Sec.
23   Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively
24   with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

25         Finally, despite his assertions to the contrary, Plaintiff's arguments appear, at most, to
26   present an alternative interpretation of the evidence.  Indeed, as best expressed by the Ninth
27   Circuit in Gardner v. Barnhart:

28         [The claimant] also asserts that the ALJ took medical reports out of

1

2

3

4

5

6

7

context and relied on them as such in making his decisions. The ALJ weighed all of the evidence he credited.  The medical evidence in this case is extensive and could be interpreted in various ways.  The ALJ interpreted it in a reasonable manner. When the evidence presented could support either affirming or reversing the Commissioner's conclusions, this court cannot substitute its own judgment for that of the Commissioner.  Here, despite any allegation of evidence taken out of context, the ALJ's conclusions are supported by substantial evidence. The ALJ supported his evaluation with articulated analysis of the evidence and citation to specific substantial evidence in the record. He cited specific reports for his conclusions and gave sufficient legitimate reasons for rejecting others.  This is all that he is required to do.

8

9

10

11

12

13

Gardner v. Barnhart, 73 Fed. App'x 193, 195 (9th Cir. 2003) (citing Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999)).  Thus, while Plaintiff generally disagrees with the ALJ's findings, as previously noted, his presentation of an alternative rational interpretation of the evidence is not sufficient to establish reversible error.  See Ford, 950 F.3d at 1154; Burch, 400 F.3d at 679 (citations omitted); Smartt v. Kijakazi, 53 F.4th 489, 499–500 (9th Cir. 2022).

14

15

16

17

18

In sum, the ALJ properly evaluated, weighed, and synthesized the medical and non-medical evidence, resolved conflicts, and determined credibility issues, see Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003);  Lingenfelter v. Astrue, 504 F.3d 1028, 1042 (9th Cir. 2007), and her findings under the functional equivalence analysis were supported by substantial evidence.  Accordingly, the ALJ's decision must be affirmed.

19

**VI.**

20

**CONCLUSION AND ORDER**

21

For the foregoing reasons, IT IS HEREBY ORDERED that:

22

23

1.    Plaintiff's motion for summary judgment appealing the decision of the Commissioner of Social Security (ECF No. 17) is DENIED;

24

25

2.    Defendant's cross-motion for summary judgment (ECF No. 18) is GRANTED; and

26

///

27

///

28

///

3.    The Clerk of the Court is DIRECTED to enter judgment in favor of Defendant Commissioner of Social Security and against Plaintiff Kendra Dickerson, on behalf of minor W.E.T., and close this case.

IT IS SO ORDERED.

Dated:   **July 21, 2023**

UNITED STATES MAGISTRATE JUDGE

39